IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

| | |
|---|---|
| ARUBALA REDDY, § | |
| § | |
| *Plaintiff,* § | |
| § | |
| v. § | CIVIL ACTION NO. _____ |
| § | |
| TEXAS TECH UNIVERSITY; its provost, § | |
| DR. RON HENDRICK, in his official capacity; § | |
| its VPR DR. JOSEPH HEPPERT, in his official § | |
| capacity, and its dean of the College of Health § | |
| and Human Sciences, DR. TIM DODD, § | |
| in his official capacity § | |
| § | |
| *Defendant.* § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

NOW COMES Arubala Reddy, Plaintiff in the above-styled and numbered cause, and files this Original Complaint against Defendant Texas Tech University and certain of its administrators, in their official capacities only. Plaintiff would respectfully show the Court the following:

### I. THE PARTIES

1.1  Plaintiff Arubala Reddy ("Dr. Reddy" or "Plaintiff") is an individual residing in Lubbock County, Texas.

1.2  Defendant Texas Tech University ("Texas Tech," the "the university," or "Tech") is an arm or instrumentality of the State of Texas, and is a public university organized under the laws of the State of Texas. Texas Tech may be served by serving Lawrence Schovanec in his capacity as President of Texas Tech University, Office of the President, Texas Tech University, 115 Administration Building, Lubbock, TX 79409.

1.3     Dr. Ron Hendrick is an individual with his place of business in Lubbock County, Texas. He may be served in his official capacity as Provost of TTU, Office of the Provost, Texas Tech University, 104 Administration Building, Box 42019, Lubbock, TX 79409.

1.5     Dr. Joseph Heppert is an individual with his place of business in Lubbock County, Texas. He may be served in his official capacity as Vice President of Research and Innovation at TTU, 2500 Broadway, Box 41075, Lubbock, Texas 79409.

1.6     Dr. Tim Dodd is an individual with his place of business in Lubbock County, Texas. He may be served in his official capacity as Dean of the College of Health & Human Sciences at TTU, Lubbock, Texas 79409.

1.7     Collectively, Dr. Ron Hendrick, Dr. Joseph Heppert, and Dr. Tim Dodd are referred to herein as the "Administrator Defendants."

## II.  JURISDICTION AND VENUE

2.1     This Court has jurisdiction over this action under 28 U.S.C. § 1331 because one or more of Plaintiff's causes of action is created by federal law, specifically Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*, 42 U.S.C. §§ 1981 and 1983, and the Fourteenth Amendment to the United States Constitution.

2.2     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b), as all or part of Plaintiff's claims accrued in Lubbock County, Texas, which is within this district and division.

## III.  FACTUAL BACKGROUND

3.1     Plaintiff's employment with Texas Tech University began in 2015 at the Texas Tech Health Science Center. She was part-time faculty at first, working as a research assistant professor in internal medicine, and in 2016 was awarded two national level grants.

3.2    In 2019, she left Texas Tech's Health Science Center and joined the faculty of Texas Tech as a Research Assistant Professor in the College of Human Sciences, within the Department of Nutritional Sciences. She remained in this position until April 2022, when she was offered a tenure track position as an Assistant Professor and Research Scientist within the same department. Plaintiff began teaching classes in August of 2022.

3.3    Before and during her time at Texas Tech, Plaintiff was committed to conducting and lead high-caliber research. At Texas Tech, Plaintiff's lab focused on understanding the molecular and cellular bases of aging, neurodegenerative diseases such as Alzheimer's, and chronic diseases like diabetes, obesity, kidney disease, heart disease, and hypertension.

3.4    While at Texas Tech, Plaintiff secured over $3.1 million in grant funding for the university and published over fifty research articles. Plaintiff brought two grants from the National Institutes of Health (NIH) and served as Principal Investigator for one such grant. Additionally, she received excellent teaching and service evaluations, and mentored a number of high school, undergraduate, and graduate students through key stages of their academic and research careers. She continually worked to advance the fields of neuroscience and nutrition sciences while providing vital support to the academic and broader communities

3.3    The chair of Dr. Reddy's department, Nikhil Dhurandhar ("Dhurandhar" or "Chair"), treated her with disrespect and disdain, due to her status as a darker-skinned Indian woman. The chair is from Mumbai, and looked down on Dr. Reddy due to her sex, due to her darker skin, and due to the part of India she is from. She learned English as an adult, and her Chair also treated her differently on that basis.

3.4    Despite her hard work, commitment to the university, and past record of achievement in obtaining and supervising grants, Plaintiff was not permitted by the chair to control

the major grant which she had obtained, and on which she was PI. Because of his lack of respect for her, and refusal to permit her to supervise her own grant, she was in the position of signing off, as a PI, on certifications which later proved not to be wholly correct.

  3.5  For instance, on a $2.7 million NIH grant, $900 was found to have been spent in a way that was contrary to the scope of the grant. Dr. Reddy had asked that the $900 purchase be made with funds from a different grant, under which the purchase was permissible, and as far as she knew, that had taken place and no funds from the $2.7 million grant were involved. Subsequently, it came to light that the wrong funds had been used, and Dr. Reddy took the blame for violating the terms of an NIH grant.

  3.6  Dr. Reddy had decades of successful laboratory science behind her when she joined Texas Tech. For thirteen years she had been a Staff Scientist II at Oregon Health Sciences University's Oregon National Primate Research Center. She was the key person running the primate center grants. She had obtained three national and two regional grants in that position, served as co-investigator, supervised laboratory research, used laboratory animals without mishap, and had never been accused of any research misconduct.

  3.7  At Texas Tech, however, where her Chair had no time for her, did not trust her to fulfill her role as principal investigator on the major grant she brought in, and treated her as inferior at every opportunity, she was subject to repeated accusations and investigations.

  3.8  Plaintiff brought with her to Tech $650,000 in R03 NIH research grant and Garrison Family Foundation grants. From 2019 until 2022, those grants funded 100% of Dr. Reddy's salary and lab set-up at Tech. When she came to Tech, Dr. Reddy's direct supervisor, Dhurandhar, told Plaintiff Reddy to just focus on her research and that the department, under his supervision, would handle all financial matters related to her two grants.

3.9     Between 2019-2022, Dr. Reddy published 35 peer-reviewed scientific papers, but the Chair never recognized her accomplishments, and Tech provided wholly inadequate lab space for her and her lab staff. In marked contrast to what was typically provided to new hires in the department, Dr. Reddy's lab had only four lab seats for her and her twelve-member staff, and the office space provided to her likewise had only four seats. The lack of support from the Chair included forcing onto Dr. Reddy two technicians who proved to have no ability, even after extensive training, to perform any useful work. Even after one of them physically attacked Dr. Reddy, the Chair would not let her exclude them from her lab.

3.10    Dhurandhar was married to a wife did not work outside the home. He and his male post-docs Vijay Hegde ("Hegde") and Andrew Shin ("Shin"), viewed Plaintiff, a quiet, dress-wearing Indian woman, as a grant-rich tool they could use, abuse, and harass without risk of her fighting back against their oppressive treatment. They exploited Plaintiff as a convenient source of free labor and money for their own research goals. Dhurandhar and his post docs would routinely demean Plaintiff, requiring she act in the capacity of an unpaid lab technician, demanding that she create projects to enable their students to get visas, and training their students in lab techniques.

3.11    Routinely, Dhurandhar and members of Hegde's lab would "borrow" expensive grant-funded antibodies, primers, and cell culture reagents from Plaintiff's lab, never returning or replacing them. Meanwhile, Dhurandhar continued to demand that Dr. Reddy help his students with mouse brain dissections and other lab work. Dhurandhar never included Plaintiff as an author on publications coming out of his lab, except for a single paper in which he misspelled her name, despite the extensive, uncompensated time she put into assisting with his students' projects that were the bases for those publications. At the time, Dr. Reddy, fearing doing so would result in her

not getting tenure, did not speak up about the abusive and hostile work environment she was being subjected to by the Chair.

3.12    On information and belief, Chair Dhurandhar had previously usurped R15 NIH grant funds from other females, including Dr. Kristina Peterson, a white woman from Australia, and Dr. Shu Wang, an Asian woman from China. Both women resigned from Tech on account of the chair's conduct.

3.13    In or around February of 2022, Plaintiff Reddy was promoted to a tenure-track Assistant Professor after receiving a five-year, $2.7 million R01 NIH research grant, based on her prior research on SSRI and subcortical brain mitochondria biogenesis. The grant would fund 80% ($90,400 annually) of Plaintiff's salary for five years, with Plaintiff serving as the Principal Investigator ("PI") over the grant. Hegde and Shin, the male post-doc's Dhurandhar had brought with him from Louisiana, were to each have 5% of their salaries paid from the grant as Co-PIs.

3.14    Once she had brought in the major NIH grant, which was to fund her research and pay her salary for several years, her Chair moved to discontinue her employment, transferring oversight of the grant to male faculty. In March 2024, he informed her that her appointment would end the following spring. Specifically, she was issued a notice of non-reappointment on March 25, 2024. This notice provided for a one-year terminal contract, resulting in Plaintiff's employment ending May 31, 2025.

3.15    At that point, there had been one investigation into Dr. Reddy's lab, and while fault was assigned to her, the recommendation of the independent investigators was not to terminate her. In fact, she completed all of the recommendations that were made. Even with the interruption to her project caused by the investigation, and the requirement that parts of her work be directly supervised, as if she were incompetent, she worked day and night to complete the research which

was underway. Such was her commitment to her research, that she undertook this task and saw it to completion single-handed, months after she had been informed that 2024-2025 would be her terminal year.

3.16    During that time period, the discriminatory actions continued. Even though Dr. Reddy had already been told she would be leaving, Tech continued to discriminate against her. After she complained to the EEO office at Tech, her Chair and others retaliated against her.

3.17    Tech's continuing adverse employment actions included investigatory overreach. For example, Tech's administrators used an anonymous accusation, that Plaintiff breached NIH confidentiality two years before, to require her to turn over her family's home computer, from which it copied every file and photo, birth records, financial records, health records – all having nothing to do with any investigation, and evidently aimed at humiliating and terrifying Dr. Reddy. Indeed, she was told that if she did not turn the computer over, the FBI would come to her house and take it. Meanwhile, she was told that she could not tell anyone that she was being investigated, so that she was afraid to let her family know where the computer had gone. When she requested that the copies of her family's records be destroyed, she received no response.

3.18    Similarly, when Tech determined that more allegations had to be investigated, in May 2024, teams from the Institutional Biosafety Committee ("IBC"), from IT, and from Tech's Office of Research descended on Dr. Reddy's lab. In a chaotic scene, Dr. Reddy found half her lab staff crying and the other half visibly upset. A team of five IBC employees, all clad in lab coats, had already entered the lab with enormous trash barrels, terrifying the lab staff and demanding they reveal the location of certain cell lines, and provide all documents related to those cell lines.

3.19    A few minutes later, an IT employee entered the lab and seized all computers and other electronics in the lab and office areas used by both Reddy and her students. Then, a

representative from Tech's Office of Research arrived, stating she was helping with the investigation and would need to confiscate all of Plaintiff's and her students' documents related to *any* research. Dr. Reddy and her students collected all files piled and them in a red wagon the investigator brought with her. Chair Dhurandhar, Hegde, and Associate Department Chair Holli Booe arrived to assist in the document grab, maximizing the drama in full view of Plaintiff's graduate and undergraduate students. Not only were materials related to ongoing research taken, but Plaintiff's lab notebooks going back to 1995, including her research notes, protocols, and other intellectual property from twenty years before she ever set foot in Lubbock, went off in the little red wagons. Tech digitized all of Dr. Ready's years of work, and although she was later told it would be destroyed, she has received no confirmation of when this might take place, or who might access her personal property before such destruction.

3.20    On or about January 23, 2025, Plaintiff filed her first charge with the EEOC alleging discrimination based on Race, National Origin, Age, Sex, and Retaliation based on her previous reports of discrimination. Retaliatory actions, and additional adverse discriminatory conduct by Texas Tech officials, based on Plaintiff's race and national origin, as well as her sex, followed such charge.

3.21    On June 9, 2025, Plaintiff filed her second charge with the EEOC alleging discrimination based on Race, Color, National Origin, Sex, and Retaliation based on her previous reports of discrimination. This second EEOC complaint was filed to encompass the ongoing retaliation that occurred after Plaintiff complained of the discriminatory action.

3.22    On August 8, 2025, Plaintiff received her right to sue on both charges, and having exhausted her administrative remedies, timely brought this lawsuit within ninety days.

## IV.  CAUSES OF ACTION

4.1  **Alternative Pleadings**.  To the extent necessary, each of the claims set forth below is pleaded in the alternative, and all allegations contained in each count below are incorporated into each other count by this reference. Further, to the extent necessary, all allegations set forth above in Section III. Factual Background (paragraphs 3.1 through 3.22 of this Complaint are hereby referenced and fully incorporated in each of the claims below by this specific reference, as though set forth in full.

*Count 1: Federal Claim under Title VII: Discrimination Based Sex, Race, Color, National Origin/Ethnicity*

4.2  Title VII of the Civil Rights Act of 1964 prohibits employment discrimination based on race, color, national origin, sex, and religion. *See* 42 U.S.C. § 2000e-2(a)(1) (prohibiting discrimination based on those protected characteristics "with respect to [an employee's] compensation, terms, conditions, or privileges of employment."). In bringing this lawsuit, Plaintiff properly sues Defendant Texas Tech University for violation of Title VII, on account of Congress' valid abrogation of Eleventh Amendment state sovereign immunity for Title VII.

4.4  Incorporating all preceding paragraphs of this Complaint, Defendant Texas Tech University discriminated against Plaintiff on the basis of her female sex, her race, her color, and her national origin in ending her employment, in taking actions even after making such decision which were intended to humiliate her and to deprive her of her intellectual property, as well as prohibiting her from applying for further NIH grants during her terminal year, changing her pay structure without notice, so that the summer pay she had previously received was discontinued, and only partially paid thereafter.

4.5  As set forth above and fully incorporated herein, Plaintiff has been damaged on account of Defendant Texas Tech University's prohibited conduct under Title VII of the Civil

Rights Act of 1964, including its discrimination against her. Plaintiff seeks damages for back pay, and either reinstatement or front pay, as well as compensatory damages in the full amount permitted under Title VII, attorneys' fees, expert fees, and all other legal or equitable relief under Title VII.

### Count 2: Federal Claim under Title VII: Retaliation

4.6     Title VII also prohibits harassment and retaliation by an employer against an employee who opposes an employment practice that violates Title VII. See 42 U.S.C. § 2000e-3(a). As set forth above, Texas Tech, through its employees, retaliated against and harassed Plaintiff for her protected activity in opposing discrimination, by its actions taken against her and her property following her reports to Tech's internal office for EEO as well as her initial Title VII charge.

4.7     Incorporating all preceding paragraphs of this Complaint, Defendant Texas Tech University retaliated against Plaintiff based on her protected activity, in taking actions even after making the decision to terminate her employment which were intended to humiliate her and to deprive her of her intellectual property, as well as prohibiting her from applying for further NIH grants during her terminal year, changing her pay structure without notice, so that the summer pay she had previously received was discontinued, and only partially paid thereafter.

4.8     As set forth above and fully incorporated herein, Plaintiff has been damaged on account of Defendant Texas Tech University's prohibited conduct under Title VII of the Civil Rights Act of 1964, including its retaliation against her. Plaintiff seeks damages for back pay, and either reinstatement or front pay, return of her private information and intellectual property or confirmation of the destruction of same, as well as compensatory damages in the full amount

permitted under Title VII, attorneys' fees, expert fees, and all other legal or equitable relief under Title VII.

### Count 3: Federal Claim under 42 U.S.C. § 1981

4.9    The discrimination against Plaintiff based on her race, national origin, and ethnicity further violated 42 U.S.C. § 1981. Pursuant to § 1981(a), Dr. Reddy is entitled to "the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens." Pursuant to § 1981(c), the Chair acted under color of law in denying her such equal benefit, and the actions against her, including the termination of her employment, would not have taken place but for her non-white race and national origin.

4.10   Dr. Reddy sues the Administrator Defendants in their official capacities as having been involved in the discrimination against Plaintiff by permitting the Chair's conduct and enforcing the decision to terminate Plaintiff's employment, as well as the other actions set forth above. They are further involved in continuing violation of her rights under federal law by refusing to reinstate her, despite their authority to do so. Plaintiff seeks injunctive and prospective relief against the Administrator Defendants, in their official capacities, for reinstatement, return or destruction of her personal records and intellectual property, and such other relief as may be permitted under applicable law.

### Count 4: Federal Claim under 42 U.S.C. § 1983; Fourteenth Amendment Equal Protection

4.11   Plaintiff would show that the conduct complained of above, all of which is incorporated herein by this reference, further violated her right to equal protection of the laws, pursuant to the Fourteenth Amendment. She therefore brings suit, as permitted by 42 U.S.C. § 1983, and the doctrine of *Ex parte Young*, against the Administrator Defendants in their official capacities as having been involved in the discrimination against Plaintiff by permitting the Chair's

conduct and enforcing the decision to terminate Plaintiff's employment, as well as the other actions set forth above. They are further involved in continuing violation of her rights under the Fourteenth Amendment by refusing to reinstate her, despite their authority to do so. Plaintiff seeks injunctive and prospective relief against the Administrator Defendants, in their official capacities, for reinstatement, return or destruction of her personal records and intellectual property, and such other relief as may be permitted under applicable law.

## V. <u>REQUESTED RELIEF</u>

5.1   As the direct and/or proximate result of Defendant Texas Tech University's actions in violation of Title VII, complained of herein, Plaintiff has been damaged and seeks recovery of the full measure of relief and damages against the university, including but not limited to prospective and injunctive relief and actual and/or economic damages, nominal damages, if applicable, damages for mental and physical anguish and emotional distress, equitable relief, and compensatory damages in an amount within the jurisdictional limits of this Court, and all other relief to which she may be entitled.

5.2   Further, due to the conduct of the Administrator Defendants, acting under color of law in their official capacities, Plaintiff has been damaged and seeks prospective and injunctive relief, including reinstatement, return or destruction of seized property, and all othehr relief to which she may be entitled.

## VI. <u>FEES, COSTS, AND INTEREST</u>

6.1   Plaintiff has retained the law firm of Hill Gilstrap, P.C. to represent her in connection with this matter, and has agreed to pay the law firm its reasonable and necessary attorneys' fees and costs in connection with such representation. Without waiving and/or limiting any other relief requested, Plaintiff seeks to recover her reasonable and necessary attorneys' fees

and costs incurred and to be incurred in bringing this suit and in all appeals of this suit, as permitted by law or in equity, specifically including 42 U.S.C. § 2000e-5(k) and 42 U.S.C. § 1988.

6.2     Plaintiff is also entitled to and seeks to recover costs of court, expert witness fees, and pre-judgment and post-judgment interest at the maximum rate permitted by law.

## VII.  CONDITIONS PRECEDENT

7.1     All conditions precedent to Plaintiff's recovery on the claims alleged herein have been performed or have occurred.

## VIII.  DEMAND FOR JURY TRIAL

8.1     Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff requests a jury trial and has tendered, or will tender, the requisite fee.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiff respectfully requests that upon final hearing, Plaintiff recover judgment against Defendant Texas Tech, and the Administrator Defendants in their official capacities, and be awarded:

(a) Against Texas Tech, any and all amounts recoverable and/or recognizable as damages under law and/or in equity, resulting and/or occasioned by the wrongful acts and/or conduct of Texas Tech or attributable to Texas Tech (as set forth above more specifically), including both actual and nominal damages;

(b) Against the Administrator Defendants, in their official capacity, injunctive and prospective relief reinstating Plaintiff, and ordering the return or destruction of her property;

(c) Her litigation expenses and costs, including but not limited to attorneys' fees and costs and any recoverable expert fees;

(d) Costs of court, pre-judgment interest, and post-judgment interest, at the maximum rate as allowed by law; and

(e) such other and further relief, both general and special, at law or in equity, to which she may be justly entitled.

Respectfully submitted,

*/s/ Frank Hill*
FRANK HILL
Texas Bar No. 09632000
fhill@hillgilstrap.com
STEFANIE M. KLEIN
Texas Bar No. 11565650
sklein@hillgilstrap.com
HILL GILSTRAP, P.C.
1400 West Abram Street
Arlington, Texas 76013

**ATTORNEYS FOR PLAINTIFF**